**CORRECTIONS**

**APPLICABILITY OF THE FEDERAL PRISON RAPE ELIMINATION ACT TO LOCAL JAILS—WHETHER LOCAL JAILS ARE UNDER THE "OPERATIONAL CONTROL" OF THE STATE'S EXECUTIVE BRANCH**

January 28, 2014

*Robert L. Green*
*Chairman, Maryland Commission*
  *on Correctional Standards*

In 2003, Congress enacted the Prison Rape Elimination Act, 42 U.S.C. §§ 15601-15609 ("PREA" or "the Act"), to address the problem of sexual assault in the nation's prisons. Broadly stated, the Act creates a mechanism for the adoption of national standards for the housing and care of inmates, and, as relevant here, conditions a state's eligibility for five percent of its federal prison-related funding on the state's ability to certify that the correctional facilities "under the operational control of the state's executive branch" have adopted, and are in full compliance with, those standards. 42 U.S.C. § 15607(e)(2)(A) (requiring certification); 28 C.F.R. § 115.501(b) (describing extent of certification obligation).

You have asked us whether compliance with PREA standards is mandatory for locally operated correctional facilities. Specifically, you ask whether local facilities are "under the operational control of the state's executive branch" such that they must comply with PREA standards for the State to maintain full federal funding.

As a threshold matter, we conclude that PREA and its standards apply to State and locally operated facilities but are not mandatory in the sense that the failure to comply with PREA constitutes a violation of federal law. However, State and local facilities face certain adverse consequences if they choose not to comply. For the State, the most immediate consequence is expressly provided as part of the statutory scheme: the State will lose five per cent of its federal prison-related funding. For local facilities, the consequences of non-compliance flow implicitly from that scheme and include a potential increase in exposure to tort liability, ineligibility for contracts for the housing of federal inmates, and a potential loss of accreditation.

The more significant question is whether local correctional facilities fall "under the operational control of the state's executive branch" such that the Governor must certify their compliance with PREA standards for the State to maintain full federal funding. As to that issue, we conclude that the Governor could reasonably determine that local facilities are generally not controlled by the State. Maryland's is not a "unified" correctional system in which local facilities are directly controlled by the State; rather, Maryland law recognizes two sets of correctional facilities, State and local. Although some local facilities are at least partly operated by county sheriffs, who have been described for some purposes as State officials "in the executive branch," we conclude that the local correctional facilities that sheriffs oversee are not under the "operational control" of the executive branch. We also conclude that, although the State correctional standards impose general requirements on the operation of local facilities, the State's development of such regulatory standards does not constitute "operational control" for purposes of PREA. However, the applicability of the PREA certification requirement to a particular local correctional facility should be determined in light of any agreements between the State and the local jurisdiction, which might provide the State with the necessary "operational control."

# I

## Background

### A. *The Prison Rape Elimination Act*

PREA was passed unanimously by both houses of Congress and signed into law on September 4, 2003. The Act was intended to address the endemic problem of sexual assaults against inmates[1] and the failure of institutions at all levels of government to prevent and respond to the occurrence of such assaults. As a first step, the Act was "to provide for the analysis of the incidence and effects of prison rape in Federal, State, and local institutions

---

[1] The national standards developed under PREA use the term "inmate" for someone confined in a prison or jail, "detainee" for someone held in a lockup, and "resident" for someone housed in a juvenile facility or community confinement facility. 77 Fed. Reg. 37106, 37107 n.1 (June 20, 2012) (discussing regulations to be codified at 28 C.F.R. pt. 115). Although PREA covers all three categories, for simplicity, we will use the term "inmates" to refer collectively to all such individuals in confinement.

and to provide information, resources, recommendations, and funding to protect individuals from prison rape." 108 Pub. L. 79, 117 Stat. 972 (Preamble). Ultimately, the Act's purpose was to "establish a zero-tolerance standard for the incidence of prison rape" in the United States, 42 U.S.C. § 15602(1), and "make[s] the prevention of prison rape a top priority in each prison system," *id*. § 15602(2).

The first section of the statute sets forth fifteen findings related to the problem of prison rape, its impact on society, and the need to address the problem through legislation. *See id*. § 15601. The Act then calls for the collection of data on the incidence of sexual assaults in federal and state systems of confinement and establishes the Review Panel on Prison Rape within the Department of Justice to oversee the collection and reporting of the data. *Id*. § 15603. The Act also creates what is now known as the National Prison Rape Elimination Commission and charges it with carrying out a "comprehensive legal and factual study" of the impact of prison rape and recommending national standards for reducing it. *Id*. § 15606.

The final operative provisions of the Act require the Department of Justice to establish "national standards for the detection, prevention, reduction, and punishment of prison rape," *id*. § 15607(a)(1), based in part on PREA-mandated studies, *id*. § 15607(a)(2), and makes 5% of federal grant funding for prisons conditional on compliance with those standards. *Id*. § 15607(c)(2). The standards must be designed to address conditions in all "prisons," which are defined to include "any confinement facility of a Federal, State, or local government, whether administered by such government or by a private organization on behalf of such government, and includes . . . any local jail or police lockup . . . [and] any juvenile facility used for the custody or care of juvenile inmates." *Id*. § 15609(7).

The standards, once promulgated, become mandatory for all federal prisons, which must implement the standards immediately. *Id*. § 15607(b). With respect to the states, the Act makes compliance with the standards a condition of the receipt of federal grants for prison purposes: Each state's governor must certify that the correctional facilities "under the operational control of the state's executive branch" comply with the standards, or else the state loses five percent of the prison-related grant funds for which it otherwise would be eligible. *Id*. § 15607(e)(2)(A); 28 C.F.R. § 115.501(b). Alternatively, a state that is unable to certify

compliance may accept the full amount of federal grant money so long as it devotes five percent of that money to adopting and bringing its facilities into "full compliance" with the standards. *Id.* § 15607(e)(2)(B). In addition, organizations that accredit federal, state, and local correctional facilities must adopt accreditation standards consistent with the national standards or lose all federal grant funding. 42 U.S.C. § 15608.[2]

## B. The National Standards

The Department of Justice issued the final National Standards to Prevent, Detect, and Respond to Prison Rape on May 17, 2012. *See* 77 Fed. Reg. 37106-232 (June 20, 2012) (codified at 28 C.F.R. pt. 115). The standards apply to four categories of facilities—adult prisons and jails, lockups, community confinement facilities, and juvenile facilities—and set forth a series of planning, training, and operational requirements specific to each type of facility. Those measures include such things as designating a "PREA coordinator" to oversee compliance efforts, 28 C.F.R. § 115.11(b); screening inmates for risk of being sexually abused and using that screening information to inform housing, bed, work, education, and program assignments, *id.* §§ 115.41, 115.42; and disciplining staff, contractors and volunteers, and inmates who have engaged in the sexual abuse of an inmate, *id.* §§ 115.76-115.78. *See generally* 77 Fed. Reg. at 37107-110.

The standards also require that, beginning on August 20, 2013, the agency with "direct responsibility for the operation" of a facility must audit it every three years to assess compliance with the standards. 28 C.F.R. § 115.401; *see also id*. § 115.5 (defining "agency").[3] The agency must schedule audits such that at least one third of each type of facility is audited in any one-year period.

---

[2] The Act also makes available to the states information and financial support to assist them in bringing their correctional facilities into compliance with PREA. It authorized grants to the states, which were distributed between 2004 and 2010, 42 U.S.C. § 15605, and established a national clearinghouse within the National Institute for Corrections for the purpose of providing information, assistance, and training to federal, State, and local authorities to support their efforts to prevent, investigate, and punish prison rape. *Id*. § 15604.

[3] The one exception to this requirement is for "individual lockups that are not utilized to house detainees overnight," which are not required to be audited. 28 C.F.R. § 115.193.

*Id.* § 115.401(b). The final rule containing the standards became effective on August 20, 2012. *See* 77 Fed. Reg. at 37106.

## C.   *Correctional Systems*

Correctional systems vary widely by state. Although, in every state, a state department of corrections has jurisdiction over all state prisons, local jurisdictions typically operate local facilities, such as jails, lock-ups, and other shorter-term detention centers. Community corrections facilities and other corrections functions such as probation and parole might be under state jurisdiction, overseen by the courts, or coordinated at the county level. *See generally* Barbara Krauth, National Institute of Corrections, *A Review of the Jail Function Within State Unified Corrections Systems* at 2 (Sept. 1997), *available at* http://static.nicic.gov/Library/014024.pdf (last visited Jan. 23, 2014). Juvenile detention facilities may also be operated by the state or by local jurisdictions. *See generally* Howard N. Snyder & Melissa Sickmund, U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, *Juvenile Offenders and Victims: 2006 National Report* (2006), *available at* http://www.ojjdp.gov/ojstatbb/nr2006) (last visited Jan. 23, 2014). In addition, most states are home to one or more federal correctional facilities operated by the Bureau of Prisons. *See* Federal Bureau of Prisons, "Maps of Facilities," http://www.bop.gov/locations/map.jsp (last visited Jan. 23, 2014).

### *Maryland State and Local Facilities*

The Correctional Services Article recognizes two categories of correctional facilities within Maryland: "local correctional facilities" and "State correctional facilities." *See* Md. Code Ann., Corr. Servs. ("CS") § 1-101(j), (o) (2008 Repl. Vol. & 2013 Supp.). The Department of Public Safety and Correctional Services ("DPSCS" or "the Department") oversees the entire State correctional, detention, and community supervision system and the divisions that operate different aspects of that system: the Division of Correction, the Patuxent Institution, the Division of Pretrial Detention and Services, the Division of Parole and Probation, and the Maryland Parole Commission. *See*, *e.g.*, *id.* § 2-201 (listing units within the Department). Within this system, the Commissioner of Correction is "in charge" of the operation of State correctional facilities, *id.* § 3-203(a), and appoints the wardens or administrators who oversee the operation of each such facility. *Id.* § 3-210(a). At present, the Division of Correction

operates 21 correctional facilities and houses additional inmates at one privately-operated community confinement facility. *See* Maryland Department of Public Safety and Correctional Services, Correctional Facility Locator, http://www.dpscs.state.md.us/ locations/prisons.shtml (last visited Jan. 23, 2014).[4]

Local correctional facilities—traditionally referred to as "jails"—are "operated . . . by one or more counties," or by the "municipal corporation" in which they are located.[5]  CS § 1-101(j).  Under the common law, the responsibility for the care and control of prisoners within local jails rested with the sheriffs, and the sheriffs retain that responsibility unless the Legislature has divested them of it.  *Bowie v. Evening News Co.*, 151 Md. 285, 297 (1926); 85 *Opinions of the Attorney General* 338, 340 (2000).  The Legislature has provided two ways in which local jurisdictions may assume direct control over the county jails.  First, counties that have adopted home rule may assume responsibility for the operation of local jails through the Express Powers Act.  *See* Md. Code Ann., Local Gov't § 10-304(c) (2013 Repl. Vol.) (authorizing charter and code counties to "establish and maintain local correctional or detention facilities and juvenile facilities" and to "regulate all individuals confined" therein); *see also generally* 85 *Opinions of the Attorney General* at 341 n.3.  Second, counties that have adopted the charter form of home rule under Article XI-A of the Maryland Constitution may additionally provide, by resolution or law, for "the appointment of a qualified individual as managing official of the local correctional facility . . . ."  CS § 11-201(b).  A county that has assumed respon-sibility for a local facility may contract with a private company to operate the facility or house inmates in a private facility, so long as the county retains the police power to "control[] the operation of the jail."  71 *Opinions of the Attorney General* 197, 203 (1986).

The State and local correctional systems include various types of facilities that fall within PREA's definition of "prison." Both systems include facilities for pretrial detention, prisoner

---

[4]  The DPSCS lists on its website several institutions that it oversees, but which either are not operated by the Division of Correction (*e.g.*, the Patuxent Institution and the Correctional Mental Health Center, which is part of Patuxent) or house no inmates (*e.g.*, the prerelease system administrative office).

[5]  The lone exception is in Baltimore City, where the Baltimore City Detention Center and the centralized booking facility are operated by the State.  *See* CS § 1-101(o)(2) (defining "State correctional facility").

intake, and longer-term incarceration, as well as "community adult rehabilitation centers" that are designed to house inmates who "can best be rehabilitated without substantial danger to the community in a local community facility." CS § 11-303(1); *see*, *e.g.*, DPSCS, "Correctional Facility Locator, http:// www.dpscs.state.md.us/locations/prisons.shtml (last visited Jan. 13, 2014) (listing State correctional facilities). The community adult rehabilitation centers are intended to be "operated by the counties," consistent with statewide standards and with State financial and technical support. *Id*. § 11-303(3). The State is authorized to "locate, construct, and operate" such a facility only if there is a "demonstrated need" for a center and the county fails to provide for one after a reasonable time. *Id*. § 11-303(3), (4). Local jurisdictions also operate shorter-term holding facilities that are located within other facilities that are not otherwise within the correctional system. One example is the "lockup," which typically is located in a county courthouse or a local police station and allows for the temporary holding of prisoners pending appearance in court or transfer to a jail or prison for longer confinement. *See*, *e.g.*, *Szukiewicz v. Warden*, *Maryland Penitentiary*, 1 Md. App. 61, 65 (1967) (referring to holding room in the courthouse as a "lock-up").

Juvenile facilities, though part of Maryland's correctional system, are managed separately from other State and local correctional facilities. Juvenile facilities are under the jurisdiction of another State agency—the Maryland Department of Juvenile Services—which oversees each stage of the juvenile justice process in Maryland. *See* Md. Code Ann., Hum. Servs. ("HU") § 9-216 (2007 Vol. & 2013 Supp.). That process includes assessment of children who are brought to a juvenile intake center; community supervision, programming, and treatment for children in the agency's care living in the community; operation of the juvenile detention programs throughout Maryland; and development of re-entry and aftercare plans for children returning to the community. *Id.* § 9-216(a); *see also id.* §§ 9-226, 9-240.

*Collaboration Between Correctional Facilities*

Although State correctional facilities are operated separately from local facilities, Maryland law allows for some interaction between the two. For example, an inmate confined in a local jail may be housed in a State correctional facility if he or she "requires specific behavioral or medical treatment or maximum security detention" that the local facility is unable to provide. CS

§ 9-303. Conversely, the State, with the agreement of the county, may transfer a minimum security inmate to a local correctional facility "for participation in community-oriented correctional programs." *Id.* § 9-304. The State may also provide financial assistance, including federal grant money, to counties that seek to construct new correctional facilities or enlarge or rehabilitate existing facilities. *Id.* §§ 11-104, 11-105. The State may also contract with the local jurisdiction to house State inmates in the new facilities. CS § 11-106(b).

State and local facilities may also agree to house federal prisoners. For example, "[o]n terms and conditions that it prescribes," the Division of Correction may accept custody of any individual sentenced to its jurisdiction by the U.S. District Court for the District of Maryland. *Id.* § 9-307(a). For local facilities, the sheriff "shall receive and keep safely in a local correctional facility each individual committed to the custody of the sheriff under authority of the United States until the individual is discharged by due course of law." CS § 11-201(a)(2)(i). The United States, for its part, is authorized by statute to contract with local authorities for the imprisonment, subsistence, care, and proper employment of federal prisoners. 18 U.S.C. § 4002.

### *The Maryland Commission on Correctional Standards*

Both State and local facilities are subject to the oversight of the Maryland Commission on Correctional Standards ("MCCS" or "the Commission"). The MCCS was established by the Legislature to advise DPSCS about standards for State, local, and privately-operated correctional facilities and to monitor the facilities' compliance with those standards. CS §§ 8-103, 8-106, 8-112. The Commission consists of the Attorney General, the Secretary of General Services, the Secretary of Budget and Management, and nine other members appointed by the Governor with the advice and consent of the Senate. CS § 8-107(a).

In its advisory capacity, the Commission recommends two sets of standards for adoption by DPSCS: "minimum mandatory" and "approved." "Minimum mandatory standards" apply to all State and local correctional facilities and govern security and inmate control, inmate safety, inmate housing and sanitation, and certain other subjects. *Id.* § 8-103(a)(1). The "approved standards" are mandatory for State facilities and optional for local jurisdictions and relate to personnel, training, and other management issues. *Id.* § 8-103(b). Both sets of standards must be "consistent with federal and State law." *Id.* § 8-103(c).

In addition to recommending standards to DPSCS for adoption, the Commission audits State and local correctional facilities to determine their compliance with the applicable standards. *Id.* § 8-113(a)(1). The Commission must set deadlines for "remedial action" whenever inspection reports indicate noncompliance with applicable standards. *Id.* § 8-113(a)(2). If the Commission determines that a facility is in violation of the minimum mandatory standards, however, the Commission must prepare a compliance plan identifying the standards that have been violated and a schedule for compliance and re-inspection. *Id.* § 8-114(a). If the facility fails to come into compliance with the plan, the Commission must embark on a series of progressively more serious enforcement measures, which may culminate in petitioning the circuit court for an order to comply with the audit findings, *id.* § 8-114(d)(1)(i), or issuing an order to "cease operation of the correctional facility," *id.* § 8-114(d)(1)(ii). *See also id.* § 8-114(b), (c).

## II

## Analysis

### A. *The PREA Standards Are Not Mandatory for State and Local Facilities.*

The national standards promulgated under PREA are mandatory for federal correctional facilities but not State and local facilities. Although the statute expressly provides that the national standards "shall apply to the Federal Bureau of Prisons immediately" upon their adoption, 42 U.S.C. § 15607(b), it does not similarly provide that the standards "shall apply" to the states or local jurisdictions. Rather, with respect to the states, PREA seeks to induce compliance by reducing federal grants "for prison purposes" by five percent if a state fails to meet PREA's standards. *Id.* § 15607(e). With respect to local jurisdictions, the statute provides no explicit mechanism for encouraging compliance with the national standards.

The guidance materials published with the national standards confirm that the standards are not mandatory for state or local correctional facilities. According to the Department of Justice, "PREA does not require State and local facilities to comply with the Department's standards, nor does it enact a mechanism for the Department to direct or enforce such compliance; instead, the

statute provides certain incentives for such confinement facilities to implement the standards." 77 Fed. Reg. at 37110.[6] Thus, "with respect to the thousands of State and local agencies, and private companies, that own and operate confinement facilities across the country, PREA provides the Department [of Justice] with no direct authority to mandate binding standards for their facilities. Instead, PREA depends upon State and local agencies to make voluntary decisions to adopt and implement them." *Id.* at 37196. By contrast, the standards apply directly "to any Federal confinement facility . . . whether administered by the Federal Government or by a private organization on behalf of the Federal Government." *Id.* at 37113.

Although the requirements of PREA are not mandatory for states and local jurisdictions, the failure to comply with the national standards has the potential for significant fiscal consequences that the State and local jurisdictions may wish to avoid. It is to these potential consequences that we now turn.

**B.** ***Although the PREA Standards Are Not Mandatory for State and Local Facilities, the Failure to Comply With Them May Expose Such Facilities to Potentially Significant Fiscal Consequences.***

The PREA national standards, while not mandatory for state and local facilities, are applicable to all "prisons," a term defined to include all state and local confinement facilities, including "any local jail or police lockup" and "any juvenile facility used for the custody or care of juvenile inmates." 42 U.S.C. § 15609(7) (defining "prison"). By "applicable" we mean to say that State and local correctional facilities must comply with the national

---

[6] The incentive-based manner in which PREA is "applicable" to state entities is typical of federal statutes enacted under the Spending Clause of the U.S. Constitution. Although, under the Tenth Amendment, Congress does not have "the authority to require the States to regulate," *New York v. United States*, 505 U.S. 144, 178 (1992), it "has broad power to set the terms on which it disburses federal money to the States." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Congress thus may condition the offer of funds on the state's compliance with conditions that the federal government could not otherwise impose directly on the states under its enumerated powers. *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2603 (2012). Such conditions are upheld if the state has "legitimate choice" as to whether to accept the federal conditions in exchange for the federal funds. *Id.*, 132 S. Ct. at 2602.

standards or risk the sanctions provided for—either explicitly or implicitly—under the Act and the national standards. The sanctions that may be imposed on State facilities differ from those that may be imposed on local facilities, and we treat them separately below.

### 1. Sanctions For State Non-Compliance and the Determination of Which Facilities Are Under the "Operational Control" of the State

As discussed above, for State correctional facilities, the sanction for non-compliance is the loss of five percent of the State's total prison-related federal grant funding. 42 U.S.C. § 15607(e)(2). To avoid the imposition of this sanction, the Governor must submit to the U.S. Attorney General, for each fiscal year, a certification that "the State has adopted, and is in full compliance with, the national standards . . . ." *Id.* § 15607(e)(2)(A). In the alternative, the Governor may submit "an assurance that not less than 5 percent of [the federal grant funds] shall be used only for the purpose of enabling the State to adopt, and achieve full compliance with," the standards. *Id.* § 15607(e)(2)(B). States that are unable to submit the necessary certification or assurance "shall" have their grant funds reduced, *id.* § 15607(e)(2); there is no room for agency enforcement discretion.

The Governor's certification is to be based primarily on the results of audits. 77 Fed. Reg. at 37188 (audits are to be the "primary factor in determining State-level 'full compliance'"). The agency with direct responsibility for the operation of correctional facilities must ensure that each facility operated by that agency, or by a private organization on behalf of that agency, is audited at least once during a three-year period. 28 C.F.R. § 115.401(a). Furthermore, during each one-year period within this three-year period, the agency must ensure that one third of each facility type operated by that agency, or by a private organization on behalf of that agency, is audited. *Id.* § 115.401(b).

Therefore, the State, in order to preserve its eligibility for federal funding, must audit all correctional facilities "under the *operational control* of the State's executive branch, including facilities operated by private entities on behalf of the State's executive branch." *Id.* § 115.501(b) (emphasis added). The certification, "by its terms, does not encompass facilities under the operational control of counties, cities, or other municipalities." 77 Fed. Reg. at 37115. The question arises, then, whether, and under what circumstances, local correctional facilities are, or may

be, subject to the "operational control" of the Executive Branch of the State.

The term "operational control" is not defined by PREA or the national standards, and no reported cases construe the meaning of the term within PREA. However, the Justice Department's Bureau of Justice Assistance, together with the National Council on Crime & Delinquency,[7] has recently published guidance identifying three "factors that may be taken into consideration in determining whether a facility is under the 'operational control' of the executive branch":

- Does the executive branch have the ability to mandate PREA compliance without judicial intervention?

- Is the State a unified correctional system?

- Does the State agency contract with a facility to confine inmates/residents on behalf of the State agency, other than inmates being temporarily held for transfer to, or release from, a State facility?

National PREA Resource Center, "Frequently Asked Questions," Audit and Compliance Question 4 (updated Nov. 27, 2013), http://www.prearesourcecenter.org/faq (last visited Jan. 23, 2014) ("PREA Guidance"). The guidance emphasizes, however, that these factors are not mandatory and that "[t]he determination of

---

[7] The Bureau of Justice Assistance provides "leadership and services in grant administration and criminal justice policy development to support local, state, and tribal justice strategies to achieve safer communities." BJA, "About the Bureau of Justice Assistance," https://www.bja.gov/About/index.html (last visited Jan. 23, 2014). The National Council on Crime & Delinquency describes itself as a private, nonprofit organization that "promotes just and equitable social systems for individuals, families, and communities through research, public policy, and practice." NCCD, "What We Do," http://www.nccdglobal.org/what-we-do (last visited Jan. 27, 2014). The BJA and NCCD jointly administer the "PREA Resource Center," which serves as a "national source for online and direct support, training, technical assistance, and research to assist adult and juvenile corrections, detention, and law enforcement professionals in their ongoing work to eliminate sexual assault in confinement." NCCD, "PREA Resource Center," http://www.nccdglobal.org/what-we-do/ prea-resource-center (last visited Jan. 23, 2014).

whether a facility is under the operational control of the executive branch is left to a governor's discretion . . . ." *Id.*

Although the guidance anticipates that the factors it identifies will "cover[] the majority of the situations that Governors may face in determining whether a facility or contractual arrangement is subject to the Governor's certification," it acknowledges that the factors are not exhaustive. *Id*. And yet, the guidance sheds little light on other considerations that may bear on the notion of "operational control." We note, however, that in other statutory contexts where the term "operational control" has significance, the term has been construed to mean control over the day-to-day operations of a facility. *See*, *e.g.*, *Donovan v. Agnew*, 712 F.2d 1509, 1514 (1st Cir. 1983) (liability of corporate officers under the Fair Labor Standards Act depends in part upon whether the officer "had operational control of significant aspects of the corporation's day to day functions"); *Fruge v. Parker Drilling Co*., 337 F.3d 558, 564 (5th Cir. 2003) ("Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way."), *cert. denied*, 540 U.S. 1161 (2004); *U.S. v. Bestfoods*, 524 U.S. 51, 66-67 (1998) (under the Comprehensive Environmental Response, Compensation, and Liability Act, an "operator" is someone who "directs the workings of, manages, or conducts the affairs of a facility" that generates pollution).

In addressing factors identified in the PREA Guidance, we will re-order them and group them with other factors that, under Maryland law, are also relevant to the determination of whether a particular local facility falls under the "operational control" of the executive branch. We first address the overall structure of the Maryland correctional system and the fact that it is not a "unified" system. We then discuss the extent to which the Maryland correctional standards allow the State to control the day-to-day operations of local facilities. And we finish with a discussion of the ways in which the State may contract for operational control over local facilities.

> ### a. The "Unified Correctional System" Inquiry— "Operational Control" as Reflected in the Structure of Maryland's Correctional System

We start with the Department of Justice's second inquiry— whether the State has a "unified correctional system"—because

we believe it relates most closely to the structure of Maryland's correctional system and to whether the State controls the day-to-day operations of local correctional facilities. In a "unified correctional system," the state maintains operational control over all aspects of the system, including jails that would be considered "local facilities" in other states. *See* Krauth at 2. Only a "small number" of states operate unified correctional systems. 77 Fed. Reg. at 37196 n.49; *see also* Krauth at 2 (identifying Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont as the only states with unified systems). Maryland is not among them; rather, it falls within the category of states in which "jails are local operations, run at the local level by a sheriff's office or a county corrections agency or, in some places, under contract by a private firm." Krauth at 2. As discussed above, DPSCS oversees "State correctional facilities," while the individual counties, or the sheriffs within them, oversee jails and other "local correctional facilities."[8] *See supra* at 7-8. In the absence of a unified correction system, we next consider whether the Maryland's correctional system gives the State's Executive Branch day-to-day "operational control" over local jails through other means.

The operation of local correctional facilities, like so many other questions of local governance, depends on the type of county at issue. Home rule counties have the power to "assume[] responsibility for operation of their jails." 85 *Opinions of the Attorney General* at 341. All home rule counties may do so under the Express Powers Act, while charter home rule counties may do so pursuant to CS § 11-201(b) as well. Either way, the local correctional facilities within those jurisdictions will be under the "operational control" of the county for purposes of PREA, unless a particular facility has entered into a contract with the State that gives the State such control. Absent such a contract, the State is not obligated by PREA to audit, or certify as PREA-compliant,

---

[8] Juvenile facilities are an exception. As discussed above, all juvenile facilities are under the jurisdiction of the Maryland Department of Juvenile Services, which oversees each stage of the juvenile justice process in Maryland. *See* HU § 9-216. Because all DJS-maintained juvenile facilities are under the "operational control" of the executive branch, the Governor must certify their compliance with PREA standards as a condition of full federal funding. We note, however, that the housing of juveniles in local correctional facilities—either when held there on a short-term basis prior to transfer to a DJS facility, or when charged as an adult and incarcerated within a local detention center—does not make those facilities subject to the State's operational control.

the correctional facilities in these 13 counties.[9] In the remaining counties, where the local correctional facilities are overseen by the sheriffs, the issue is a closer call.

In Maryland, each sheriff has "some characteristics of a state official and some characteristics of a local government official." *Ritchie v. Donnelly*, 324 Md. 344, 357 (1991). Under Maryland law, a sheriff is a State official. *Wolfe v. Anne Arundel County*, 374 Md. 20, 33-34 (2003); 85 *Opinions of the Attorney General* at 340. The office of the sheriff is established by the Maryland Constitution, *see* Md. Const., Art. IV, § 44, and the sheriff exercises common law duties that may be altered only by the General Assembly or, with respect to certain powers, by rule of the Court of Appeals. *Prince George's County v. Aluisi*, 354 Md. 422, 433 (1999); *Soper v. Montgomery County*, 294 Md. 331, 337 (1982); 85 *Opinions of the Attorney General* at 340; *see also* SG § 15-102(ll) (defining "State official" to include "a sheriff" for purposes of the Maryland Public Ethics Law).

The sheriff's general status as a State official, however, "does not mean that, for some purposes and in some contexts, a sheriff may not be treated as a local government employee." *Rucker v. Harford County*, 316 Md. 275, 289 (1989). The counties provide funding for sheriffs' offices and thus maintain "a degree of local control" over their operation. *Id*. at 288; *see* Md. Code Ann., Local Gov't § 16-106(3) (providing that the "budget and fiscal policies and purchasing laws of a county govern . . . the sheriff's office in the county"). Counties may also treat sheriffs as local government employees for purposes of affording them benefits, such as a county-established pension plan. *Rucker*, 316 Md. at 289-90. And within the context of legal representation, tort claims involving the sheriffs' operation of local correctional

---

[9] It appears to us that 13 counties are currently authorized to appoint an official other than the sheriff to oversee the operation of local correctional facilities within their boundaries. *See* CS § 11-703 and § 2-1-504 Anne Arundel County Code; CS § 11-705 and § 3-2-301 Baltimore County Code; § 23-1 Caroline County Code; CS § 11-711 and § 75-1 Dorchester County Code; CS § 11-715 and § 7.501 Howard County Code; CS § 11-716 (Kent County); CS § 11-717 (Montgomery County); CS § 11-718 and § 18-108 Prince George's County Code; CS § 11-719 and § 4-12(g) Queen Anne's County Code; § 12-101 Somerset County Code; § 42-1 Talbot County Code; CS § 11-724 and § 20-1 Wicomico County Code; and § PS 5-101 Worcester County Code.

facilities are defended by the local jurisdiction and its insurance carrier—the Local Government Insurance Trust—and not the Attorney General's Office. *See* Md. Code Ann., State Fin. & Proc. § 9-108(a)(6) (2009 Repl. Vol. & 2013 Supp.) (authorizing a county or Baltimore City to obtain insurance coverage for claims arising out of a sheriff's "activities relating to performing . . . detention center functions").

The dual nature of the sheriff's office is reflected in federal law as well. For purposes of claims under 42 U.S.C. § 1983, "a sheriff may sometimes be treated as a state official and sometimes as a local official, depending upon the particular function which the sheriff was performing." *Ritchie*, 324 Md. at 357; *see also*, *e.g.*, *Dotson v. Chester*, 937 F.2d 920, 926-27, 932 (4th Cir. 1991) (when operating a local jail, sheriff is the county's "final policymaking authority" for purposes of § 1983 liability); *but cf. Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 377 (D. Md. 2011) (holding State, not county, was proper defendant where sheriff was alleged to have operated jail in violation of Americans with Disabilities Act); *Kronk v. Carroll County*, 2012 U.S. Dist. LEXIS 8611, *22-23 (D. Md. 2012) (sheriff, when acting as director of local detention center, is a State official immune from liability under the Family Medical Leave Act).

This same duality affects the issue of whether the sheriffs fall under the Executive Branch of State government for purposes of PREA's "operational control" standard. The Court of Special Appeals has declared it "[b]eyond doubt" that the sheriff's office, at least when it is engaged in law enforcement, "is an agency of the executive branch of government." *Miner v. Novotny*, 60 Md. App. 124, 129 (1984), *aff'd*, 304 Md. 164 (1985); *see also* SG § 15-102(m) (defining "executive unit" to include "the office of the sheriff in each county" for purposes of the Maryland Public Ethics Law). And sheriffs, when overseeing local jails, perform much the same role performed by DPSCS officials, who unquestionably operate within the executive branch.

At the same time, the office of the sheriff finds its origin within Article IV of the Maryland Constitution, which describes the "Judiciary Department," and not within Article II, which describes the Executive Branch. *See also* Maryland Manual, "Local Government," *available at* http://msa.maryland.gov/msa/ mdmanual/01glance/html/county.html (last visited Jan. 27, 2014) (placing each county's sheriff's office within the judicial branch of each county). The duties of the sheriff have always included a variety of functions integral to the safety and orderly operation of

the courts. 57 *Opinions of the Attorney General* 614 (1972) (describing historic functions of sheriffs in relation to courts). Indeed, the sheriff's oversight of local prisons appears to have developed from this court function. *See* William L. Murfree, Sr., *A Treatise on the Law of Sheriffs and Other Ministerial Officers*, at 21, § 40 (2d ed. 1890) ("For a thousand years" it has been the function of the sheriff to "execute the mandates of courts, and to keep securely in confinement, all such prisoners as may be committed to his charge by civil or criminal process emanating from courts of adequate jurisdiction. For this purpose he had, and has, jurisdiction of the county prisons, and is in effect the jailor by virtue of his office.").

Ultimately, we need not fix the sheriffs' formal position within government to reach the conclusion that the local correctional facilities they oversee do not fall under the "operational control of the State's executive branch" for purposes of PREA. We have previously stated within the prison construction context that the sheriff's status as a State official does not alter the local nature of county jails: "It is beyond dispute that a county detention center is a county facility, regardless of whether the local sheriff is responsible for its operation." 85 *Opinions of the Attorney General* at 344. Nor does the fact that sheriffs sometimes exercise executive powers mean that, when overseeing local jails, they act "under the operational control of the state's executive branch." The sheriff occupies a constitutional office that lies outside the executive branch command structure; although the Governor fills a vacancy in the office, Md. Const., Art. IV, § 44, the sheriff does not answer to the Governor in the same way as the Secretary and employees of DPSCS. And, unlike executive branch employees, over whose duties the Governor maintains a significant measure of control,[10] the duties of the sheriff are controlled only "by State

---

[10] *See* Md. Const., Art. II, § 24 ("The Governor may make changes in the organization of the Executive Branch," including "the reallocation or reassignment of functions, powers, and duties among the departments, offices, agencies, and instrumentalities of the Executive Branch."); Md. Code Ann., State Gov't § 3-302 (recognizing Governor's power to "supervise and direct the officers and units in [the Executive] Branch"); Md. Code Ann., State Pers. & Pens. § 3-302 (2009 Repl. Vol. & 2013 Supp.) (the State, through its appropriate "officers and employees" has the right to determine "the work projects, tours of duty, methods, means, and personnel by which its operations are to be conducted," and to "direct, supervise, and assign employees," so as to

common law, by the General Assembly and by the Judiciary . . . ." *Rucker*, 316 Md. at 287; *see also* 78 *Opinions of the Attorney General* 103, 105 (1993). Given that the PREA Guidance has "left to a governor's discretion" the determination whether a facility is under the operational control of the executive branch, we think it unlikely that Congress or the Department of Justice intended that a governor certify the compliance of constitutional officers who do not answer to him or her.

In sum, in assessing whether the State exerts "operational control" over local facilities, we assign less significance to the formal status of the sheriffs, and greater significance to the fact that, legally and practically speaking, local correctional facilities are not under the institutional control of DPSCS, the Division of Correction, or any other entity answerable to the Governor. In counties where a correctional facility is maintained under authority of the sheriff, it is the sheriff, and not a DPSCS employee, who is responsible for "keep[ing] safely each individual committed . . . to the custody of the sheriff until the individual is discharged by due course of law." CS § 11-201(a). We therefore conclude that the structure of Maryland's correctional system does not place local correctional facilities under the "operational control" of the State Executive Branch.

### b. The "Ability to Mandate PREA Compliance" Inquiry—"Operational Control" Under the Maryland Correctional Standards as Applicable to Local Jails

Under the PREA Guidance, the executive branch's "ability to mandate PREA compliance without judicial intervention" is a factor to be considered in determining whether the State has "operational control" over a particular local facility. As discussed above, DPSCS, with the advice of the MCCS, must adopt minimum standards for the "security," "control," "housing," and "sanitation" of inmates with which all State and local correctional facilities must comply. CS § 8-103(a)(1). Because the standards the Commission adopts must be "consistent with federal and State law," CS § 8-103(c), we see no reason why DPSCS could not incorporate PREA requirements into the minimum correctional standards applicable to local correctional facilities. The State's development of minimum mandatory standards applicable to local

---

"maintain and improve the efficiency and effectiveness of governmental operations").

correctional facilities thus constitutes a second way in which the State might arguably be considered to wield "operational control" over such facilities for purposes of PREA.

While DPSCS might have the authority to enact correctional standards that require local correctional facilities to comply with PREA, we do not believe that this type of quasi-legislative regulatory authority gives DPSCS "operational control" over local facilities any more than the Department of Justice has "operational control" over the facilities to which its standards apply. We see a fundamental difference between *operational* control over the day-to-day functioning of a facility and *regulatory* control to enforce compliance with a given set of rules. *See*, *e.g.*, *In re Advisory Opinion to the Governor*, 856 A.2d 320, 331-32 (R.I. 2004) (concluding that casino developer would have "operational control of the proposed casino while the Lottery Commission would have only regulatory control" when the casino "would make day-to-day decisions having to do with the functioning of the proposed casino while the Lottery Commission merely would enforce the applicable regulations").

Moreover, the correctional standards the State has adopted are not sufficiently specific to afford the Department "operational control" over local correctional facilities. The standards require only that correctional facilities develop a written plan or policy for a particular aspect of operations; they do not dictate the details of what the plan or policy must include. For example, the standards applicable to Adult Correctional Institutions require that "[t]he managing official" of the facility develop "a written policy which . . . [e]stablishes inmate protection from physical and mental abuse, and harassment . . . ." COMAR 12.14.04.05A(2). The standards do not, however, specify *how* the State or local officials must operate the facilities under their control to achieve the desired goal. *See* DPSCS, "Adult Correctional Institution Standards Manual" at 49, ¶5B, http://www.dpscs.state.md.us/ publicinfo/publications/pdfs/MCCS/StandardsManual-ACI-02-2012.pdf (last visited Jan. 27, 2014). Although the Commission could endeavor to make its standards more specific, we do not believe that such quasi-legislative standards could ever give the State day-to-day "operational control" over local facilities.

The manner in which the correctional standards are enforced also suggests that the State typically cannot enforce PREA compliance through the imposition of the correctional standards

without judicial intervention. As discussed above, facilities that do not comply with the correctional standards are subject to a series of increasingly intrusive auditing measures designed to encourage compliance. *See* CS § 8-114(a)-(c). The MCCS, however, does not itself have the power to compel the facility to come into compliance; for that the MCCS must "petition a circuit court . . . for a court order requiring the correctional facility to comply with the audit findings." *Id.* § 8-114(d)(1)(i). While the Commission may issue an order to "cease operation of the correctional facility," *id.* § 8-114(d)(1)(ii), the only mechanism for enforcing any particular standard—including compliance with PREA—is judicial intervention.

Although no reported Maryland case addresses the correctional standards and what they say about the control of local jails, the Fourth Circuit, in *Dotson v. Chester*, concluded that the correctional standards established by the Commission "do[] not transform the County Jail into a state facility." 937 F.2d at 932. The Fourth Circuit rejected the County Commissioners' argument that, "because of these [MCCS] standards, the State and the State alone controls the Sheriff's operation of the County Jail." *Id.* at 931. The court noted that the "broad standards often require only the establishment of written policies to cover situations, leaving open room for interpretation and sheriff and county responsibility for implementation." *Id.* We too are unable to conclude that the Commission's power to establish correctional standards provides the Executive Branch of the State with "operational control" of local correctional facilities. Although the quasi-legislative standards provide important direction for local correctional facilities, they do not control the day-to-day operations of those facilities.

### c. The "State Contracts" Inquiry—"Operational Control" Through Contracts for Housing State Inmates

The PREA Guidance also indicates that states may, under certain circumstances, gain "operational control" over local correctional facilities by contracting to house state inmates in such facilities. In Maryland, a State inmate typically is housed in a local facility when the Division of Correction, with the county's agreement, transfers a State inmate to a local community correctional facility in order to ease the inmate's transition back into his or her home jurisdiction. CS § 9-304. As the guidance suggests, this type of limited involvement in the housing of State inmates is not sufficient to constitute state "operational control." *See* PREA Guidance (whether a State agency contracts with local

facilities to house State inmates is a relevant factor unless the inmates are only "being temporarily held for transfer to, or release from, a State facility"). The fact that the number of inmates transferred amounts to a small percentage of the overall population of the local correctional facility further compels the conclusion that such transfers do not place the State in operational control of the local facility.

The Division's authority to house State inmates in a local facility on a more permanent basis does not change this result. The Division may place State inmates in local facilities as a condition of State funding for the construction of the facility, CS § 11-106(b), and may also arrange for the housing of State inmates in local jails with the consent of the local jurisdiction. *See generally* 62 *Opinions of the Attorney General* 829, 833 (1977). We have previously observed that, in these situations, "[t]he State prisoners may be regarded in the constructive custody of the Division of Correction even though not in its actual custody." *Id*. at 836.

But the fact that the State has constructive custody of an inmate housed in a local correctional facility does not, by itself, give the State control over the day-to-day operations of the local facility. *Cf. Logue v. United States*, 412 U.S. 521 (1973) (federal government not liable for actions of county jail officials with whom it had contracted for the housing of federal inmates when the statute and contract gave the federal government no power to control the day-to-day operations of county jail). As was the case with the inmates transferred by the federal government in *Logue*, inmates transferred by the State to local correctional facilities, are, by agreement, subject to the day-to-day control of the local correctional facility, which typically is responsible for "hous[ing] and maintain[ing]" them in accordance with applicable correctional standards. *See*, *e.g.*, Memorandum of Understanding Between the Department of Public Safety and Correctional Services and the Howard County Department of Corrections, ¶ 6E.

The State could also obtain "operational control" over a local facility through other agreements relating to the administration of such facilities. For example, two or more counties may "enter into a written agreement . . . as to allocation of responsibility, construction, operation, maintenance, and appointment of personnel in connection with a local correctional facility." CS § 11-102(b)(1). Because the State may be a party to such an agreement, *id.* at § 11-102(b)(2), there is at least the

possibility that the State may gain some operational control as a result of the agreement. We know of no such arrangements, however, and, in their absence, it is the county-appointed "managing official of a local correctional facility," not the State or the Department or the Division of Correction, who "is responsible for the safekeeping and care of each inmate . . . detained in or sentenced to the local correctional facility. . . ." *Id.* § 11-103(a); *see also id.* § 11-201(b)(2) (in charter counties, managing official of local correctional facility is responsible for the "safekeeping, care, and feeding of inmates in the custody of . . . [the] facility"). Nevertheless, whether the State asserts "operational control" over a local facility will depend on the terms of the specific contract that governs the housing of State inmates in that facility. In the absence of contractual provisions allocating the responsibility of day-to-day operations to the State, the local correctional facilities that house State inmates remain under the "operational control" of the local jurisdiction, not the Executive Branch.

That does not mean that the State has no PREA obligations with respect to the local facilities with which it contracts. The State must include in any new or renewed contract for the confinement of its inmates a provision that requires the local facility to adopt and comply with PREA standards. 28 C.F.R. § 115.12(a); *see also id.* §§ 115.112(a) (regarding law enforcement agency contracts for confining lockup detainees); 115.212(a) (community confinement facility residents); 115.312(a) (juvenile facility residents). Any new or renewed contract that a state enters into with a local facility must also "provide for [state] agency contract monitoring to ensure that the contractor is complying with the PREA standards."[11] *Id.* § 115.12(b). However, the national standards require only that these provisions be included within the contracts and monitored; "[b]eyond that, the Department sees no need to specify the manner in which an agency enforces . . . compliance" with such provisions. 77 Fed. Reg. at 37118. Accordingly, the State, in order to certify compliance with PREA, must include the necessary provisions within its contracts with local facilities and monitor the facility's compliance with those provisions. The Governor need not, however, certify that the local facility is in compliance with the

---

[11] The rules allow an exception to this requirement for states that contract with outside entities for the confinement of residents at Community Confinement Facilities. In emergency situations, "the public agency may enter into a contract with an entity that fails to comply with these standards." 28 C.F.R. § 115.212(c).

PREA standards unless the facility is otherwise under the "operational control" of the State's Executive Branch.

To summarize, in the absence of statutory and regulatory provisions that define the term "operational control," the PREA Guidance ultimately leaves it to the "governor's discretion" to determine whether a local correctional facility is under executive control for purposes of the State's PREA certification. Although the guidance suggests factors that "may be taken into consideration," none appears to be dispositive of the issue of control. Nevertheless, after evaluating those factors, as well as other factors that we believe bear on the issue, we conclude that, except where facility-specific contracts provide otherwise, it would be within the Governor's discretion to determine that local correctional facilities are not under the "operational control" of the executive branch.

### 2. Consequences for Local Facilities that Fail to Comply with PREA Standards.

Although PREA requires federal facilities to comply with the national standards and encourages State facilities to do so through the threatened loss of grant funds, it provides no "corresponding sanctions" for local facilities that do not comply. 77 Fed. Reg. at 37196. The Department of Justice makes this clear in the preamble to the national standards: "For county, municipal, and privately run agencies that operate confinement facilities, PREA lacks any corresponding sanctions for facilities that do not adopt or comply with the standards." *Id.* The preamble goes on to note, however, that with regard to such local facilities "other consequences may flow from the issuance of national standards, which could provide incentives for voluntary compliance." *Id.* Those consequences flow from the way in which the PREA standards affect the negligence standard applicable in tort cases, the local facility's eligibility for future contracts with the federal government, and the availability of accreditation of local correctional facilities. It is to these other potential consequences that we now turn.

### a. Standard of Care

Because PREA does not create a private right of action, *see Byrd v. S.C. Dep't of Corr.*, 2013 U.S. Dist. LEXIS 134227, *26-27 (D.S.C. 2013), a state or local facility's non-compliance with the national standards does not, by itself, expose the facility or its employees to liability. A court may, however, consider a prison

official's non-compliance with the national standards in determining whether he or she has acted negligently.

A negligence claim involves three principal elements: "(a) a duty owed by the defendant to the plaintiff, (b) a breach of that duty and (c) injury proximately resulting from that breach." *Pendleton v. State*, 398 Md. 447, 458 (2007) (quoting *Scott v. Jenkins*, 345 Md. 21, 28 (1997)) (internal citations and quotation marks omitted). Under certain circumstances, "the requirements of a legislative enactment"—such as PREA—may serve as "the standard of conduct" for purposes of negligence claims. Restatement (Second) of Torts § 286 (2013 Supp.); *see Rivers v. Hagner Mgmt. Corp.*, 182 Md. App. 632, 653-54 (2008) (violation of statute admissible as evidence of negligence where the statutory scheme is designed to protect a class of persons which includes the plaintiff), *cert. denied*, 407 Md. 276 (2009). Although no published Maryland decision addresses the interplay between PREA and the elements of a negligence action, courts in other states have. *See*, *e.g.*, *Giraldo v. Department of Corrections & Rehabilitation*, 168 Cal. App. 4th 231, 250-51 (Cal. App. 1st Dist. 2008) (inmate's negligence claim should not have been dismissed for lack of duty; as PREA shows, "[i]t is manifestly foreseeable that an inmate may be at risk of harm"), *petition for review denied*, 2009 Cal. LEXIS 1757 (2009). Accordingly, local jurisdictions that elect not to adopt the PREA standards arguably leave themselves open to increased possibility of liability.

The enactment of PREA may also bear on the facility's obligation under the Eighth Amendment of the U.S. Constitution not to engage in "cruel and unusual punishment." That obligation requires prison officials to take reasonable steps to protect inmates from physical abuse. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent" to a substantial risk of serious harm to the inmate's safety. *Id*. at 834. The deliberate indifference standard requires, in part, that the prison official "know[] of and disregard[] an excessive risk to inmate health or safety." *Id*. at 837; *see also Inscoe v. Yates*, 2009 U.S. Dist. LEXIS 108295, *6-7 (E.D. Cal. 2009).

The implementation of PREA will generate data on the prevalence of prison rape in specific facilities, which inmate plaintiffs likely will seek to use in an effort to establish that prison officials were aware of, but "deliberately indifferent" to, the risk of sexual assault. *Lobozzo v. Colo. Dep't of Corr.*, 429 Fed. Appx. 707, 711 (10th Cir. 2011) (rejecting, as unsupported by fact, plaintiff inmate's argument that PREA data "gave officials

constructive notice of the danger" of prison rape); *Myers v. Grubb*, 2012 U.S. Dist. LEXIS 142780 (D. Mont. 2012) (rejecting, for lack of specificity, inmate-plaintiff's claim that prison official's failure to establish PREA policies constituted actionable "deliberate indifference").  As one commentator has observed, "PREA's standards for improved prison management will entail more specific duties for prison supervisors to prevent inmate-on-inmate rapes, and the data generated by studies under the statute will help prisoners enforce those duties through litigation."  David K. Ries, *Note and Comment: "Duty-to-Protect Claims By Inmates After the Prison Rape Elimination Act*," 13 J.L. & Pol'y 915, 976 (2005).  Thus, while PREA is not mandatory for either State or local facilities, its enactment may, over time, affect the contours of the facilities' tort liability.

### b.    Loss of Federal Contracts

Failure to comply with the national standards may also threaten the loss of, or inability to obtain, contracts for the housing of federal inmates in State and local facilities.  The United States is authorized by statute to contract with local authorities for the imprisonment, subsistence, care, and proper employment of federal prisoners.  18 U.S.C. § 4002; *see also id.* § 3621(b) (authorizing the federal Bureau of Prisons to designate, as the place of the prisoner's imprisonment, "any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau").  The Maryland Division of Correction similarly is authorized to accept custody of individuals who are sentenced to its jurisdiction by the U.S. District Court for the District of Maryland,  CS § 9-307, and may also enter into agreements with the United States to house federal prisoners under the Interstate Corrections Compact, CS §§ 8-601–8-611.  It is our understanding that, for many Maryland counties, such contractual arrangements are a source of income for local facilities.

PREA requires that all non-federal facilities that contract with a federal agency for the housing of federal inmates be contractually bound to comply with PREA.  Specifically, "[t]he standard requires that new contracts or contract renewals include a provision that obligates the entity to adopt and comply with the PREA standards."  77 Fed. Reg. at 37118.  Any new contract or contract renewal must also "provide for [federal] agency contract monitoring to ensure that the contractor is complying with the

PREA standards." *See* 28 U.S.C. §§ 115.12(b); 115.112(b); 115.212(b); 115.312(b).

The contract standard does not "require agencies to impose financial sanctions on non-compliant private contractors," *id*., and, presumably, State and local contractors as well. Instead, the standard requires only that new contracts or contract renewals "include a provision that obligates the entity to adopt and comply with the PREA standards. Beyond that, the Department [of Justice] sees no need to specify the manner in which an agency enforces such compliance." 77 Fed. Reg. at 37118. However, although PREA does not mandate any particular means of enforcing a local facilities' contractual promise to be PREA-compliant, the Bureau of Prisons may itself stipulate penalties in the contract in the event that a local facility is found to be non-compliant. It also seems likely that the Bureau of Prisons, at the very least, would decline to contract with local facilities that have not adopted and complied with the national standards.

### c. Loss of Accreditation

The failure of a State or local facility to adopt and comply with the PREA standards may also affect its ability to obtain, or retain, accreditation. Under PREA, any organization responsible for the accreditation of federal, State, local, or private prisons, jails, or other penal facilities must by now have adopted accreditation standards consistent with the national standards. 42 U.S.C. § 15608(b)(2) (requiring that such organizations have adopted the national standards one year after their adoption, which occurred on May 17, 2012). Accreditation organizations that do not adopt the PREA standards will be ineligible for federal grants. *Id.* § 15608(a).

A facility's failure to comply with the national standards, however, does not necessarily disqualify it for accreditation. Neither PREA nor its national standards mandate the weight that must be given to the violation of PREA standards in an accreditation organization's overall analysis of a facility, and there are ways in which correctional facilities seeking accreditation may "opt out" of certain non-mandatory standards.[12]

---

[12] *See* Lynn S. Branham, *Opening Up a Closed World: A Sourcebook on Prison Oversight: Correctional Oversight in the United States: Accrediting the Accreditors: A New Paradigm for Correctional Oversight*, 30 Pace L. Rev. 1656, 1661-62 (2010) (describing facilities' ability to obtain a "waiver" of specific requirements that it is unable to

Nevertheless, the potential loss of accreditation is a further adverse consequence that non-compliant State or local facilities may suffer.[13]

### d. Adverse Publicity

The failure of a State or local correctional facility to adopt the PREA standards might also expose the facility to adverse publicity. The Act requires the Justice Department to carry out an annual "review and analysis of the incidence and effects of prison rape," 42 U.S.C. § 15603(a)(1), and publish a report including, among other things, a "listing" of the surveyed correctional facilities "ranked according to the incidence of prison rape in each institution." *Id*. § 15603(c)(2)(B)(ii). The survey process also provides an opportunity for positive publicity: The report must identify "those institutions that appear to have been successful in deterring prison rape." *Id*. § 15603(c)(2)(B)(iii). We expect that correctional facilities will take such publicity—good or bad—into consideration when deciding whether to comply with PREA and the national standards.

## III

### Conclusion

PREA and its standards, although applicable to all correctional facilities within the State, are not mandatory in the sense that the failure to comply with PREA constitutes a violation

---

meet, and to opt out of standards that it "does not wish to comply with"); *see also* ACA, Agency Manual of Accreditation Policy and Procedure at 42-43 (March 2012), https://www.aca.org/standards/pdfs/AccreditationPolicyProcedure.pdf (last visited Jan. 27, 2014) (describing "discretionary compliance" option "in which agencies choose not to comply with a particular standard").

[13] It is our understanding that, currently, the Western Correctional Institution (Cumberland) and the Eastern Correctional Institution (Westover) are the only two State facilities accredited by the ACA. State law appears to have contributed to the limited accreditation rate. Prior to July 1, 2013, State law had prohibited the use of State general funds to "implement standards for State correctional facilities that are adopted or proposed by ACA," CS § 8-104; rather, funding for ACA accreditation had to be expressly included in the budget. Legislation enacted in 2013, however, removed that obstacle to ACA accreditation, *see* 2013 Md. Laws, ch. 688 (repealing CS § 8-104), thus making it easier for additional facilities to obtain accreditation.

of federal law that would expose the facility to penalties or injunctive relief under the Act. The decision by State-operated correctional facilities not to adopt PREA standards, however, will result in the loss of five percent of the State's prison-related federal funding. To maintain the State's eligibility for full federal funding, the Governor must certify that all facilities under the "operational control" of the state's executive branch comply with PREA. In the absence of statutory and regulatory provisions that define the term "operational control," federal guidance ultimately leaves it to the "governor's discretion" to determine whether a local correctional facility is under executive control for purposes of the State's PREA certification. We conclude that the Governor, after considering the factors suggested in that guidance, as well as other factors that we believe bear on the issue, would have grounds on which to conclude that local correctional facilities are not under the "operational control" of the executive branch. The applicability of the PREA certification requirement to a particular local correctional facility must be determined in light of any agreements between the State and the local jurisdiction, which might provide the State with the necessary "operational control."

Although we conclude that local correctional facilities generally need not comply with PREA standards for the State to certify its compliance with the same, we note that a local facility's decision not to implement the PREA standards may result in other adverse consequences not reflected within PREA. Such consequences include potential ineligibility for contracts to house federal inmates at local facilities, loss of accreditation, and increased potential for liability in tort stemming from the application of a more rigorous standard of care.

> Douglas F. Gansler
> Attorney General
>
> Adam D. Snyder
> *Chief Counsel,*
>   *Opinions & Advice*

* Franklin Branch and Jeffrey Middleton, interns in the Opinions and Advice Division, contributed substantially to the preparation of this opinion.